[No. G035909. Fourth Dist., Div. Three. Sept. 27, 2006.]

In re ISIDRO CALDERON HERNANDEZ on Habeas Corpus.

**COUNSEL**

Doris M. Frizzell, under appointment by the Court of Appeal, for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale, Anthony Da Silva and Lise Jacobson, Deputy Attorneys General, for Respondent.

**OPINION**

**MOORE, J.**—In July 2000, petitioner Isidro Calderon Hernandez was charged with murder, kidnapping, hit-and-run driving causing injury and death, and filing a fraudulent insurance claim. In June 2001, the court suspended criminal proceedings pursuant to Penal Code section 1368 to evaluate petitioner's mental competence. (All further statutory references are to the Penal Code unless otherwise stated.) Under the authority of section 1369, the court appointed two psychiatrists, Dr. Kaushal Sharma and Dr. Enani D'Angelo, to evaluate petitioner's competency to stand trial.

In May 2002, the court concluded petitioner was not competent to stand trial and committed him to Patton State Hospital. (§ 1370, subd. (a)(1)(B)(i).) Dr. Dennis Wallstrom interviewed and tested petitioner during his approximately one-year confinement at Patton State Hospital before petitioner's restoration to competency and return to Orange County for trial. (§ 1372.) Petitioner entered pleas of not guilty and not guilty by reason of insanity. (§§ 1016, 1026.) Petitioner's plea of not guilty by reason of insanity

prompted the court's appointment of Sharma, D'Angelo, and licensed psychologist Dr. Martha Rogers to investigate and examine petitioner's mental status. (§ 1027.)

The guilt phase of petitioner's trial began on January 13, 2004. On January 28, the jury convicted petitioner of first degree murder, kidnapping, hit-and-run driving causing death, and making a fraudulent insurance claim. Following a separate sanity trial, the jury found that as to each crime petitioner was capable of knowing or understanding the nature and quality of his acts, or that he was able to distinguish right from wrong at the time of the commission of the crimes.

The court denied petitioner's motion for a new trial and sentenced him to a prison term of 25 years to life for first degree murder with a concurrent five-year term for insurance fraud. The court stayed imposition of sentence on the remaining counts pursuant to section 654.

Petitioner filed a timely notice of appeal. The appeal raises several issues, including a challenge to the competence of his trial counsel, which are addressed in a separate opinion.[1] (*People v. Hernandez* (Sept. 27, 2006, G034061) [nonpub. opn.].) Two months after filing his notice of appeal, petitioner filed the instant petition for writ of habeas corpus, claiming his counsel's failure to object to inadmissible expert testimony at the sanity phase resulted in prejudicial error. Initially, we invited the Attorney General to file an informal response. However, on February 28, 2006, we issued an order to show cause and set oral argument.

After consideration of the formal and informal pleadings of the parties, the arguments of counsel, and additional briefing from the parties on certain procedural questions,[2] we agree with petitioner's assertion and conclude his trial counsel committed prejudicial error by failing to object to the testimony of the prosecution's expert witnesses at the sanity trial. The court appointed Sharma to evaluate petitioner's competency to stand trial. Wallstrom evaluated petitioner's competency over a period of nearly one year during his involuntary commitment to Patton State Hospital. The court appointed Rogers to examine petitioner's mental state with regard to his plea of not guilty by reason of insanity. She also reviewed numerous records and reports prepared in connection with the competency evaluations.

█ Petitioner's statements to Sharma and Wallstrom are subject to the judicially declared rule of immunity adopted and reaffirmed in several

---

[1] The parties' request for judicial notice of the appellate record is granted.

[2] The Attorney General's request to file supplemental briefing outside the scope of this court's request is denied.

decisions of the California Supreme Court and petitioner's Fifth Amendment privilege against self-incrimination. Consequently, their testimony at the sanity phase was inadmissible. This judicially declared rule of immunity applies to an accused's statements to the competency evaluators and to any fruits of the mental competency examination. Thus, it extends to Rogers's reliance on the records and reports prepared in connection with the competency evaluations. Because it is impossible to determine to what extent the competency evaluation results affected Rogers's opinion of petitioner's sanity, her testimony should also have been excluded.

The admission of otherwise inadmissible testimony occurred as the result of petitioner's trial counsel's error, and we have concluded there is a reasonable probability that but for counsel's error the result would have been more favorable to petitioner. Consequently, the petition is granted and the matter remanded for a new trial limited to the issue of petitioner's sanity.

## I

## FACTS

On August 22, 1999, at approximately 11:30 p.m., three friends of 18-year-old cyclist John Labord watched in horror as petitioner, the driver of a white Honda Civic, hit Labord while he was riding his bicycle on Orangewood Avenue in Anaheim. Labord's friends thought they heard the car accelerate just before the impact and watched as it swerved, sped away from the scene, and drove onto the 57 Freeway. Labord's friends found his bicycle broken in two approximately 200 feet from the point of impact. However, they did not find their friend.

Early the following morning, a motorist discovered Labord's body in a turnout off the 241 Tollway, approximately 13 miles from the point of impact. According to the autopsy, Labord died from exsanguination caused by a large wound on his right forearm. His body had sustained abrasions and a fracture to the right leg, but there were no major injuries to his head or internal organs. The coroner estimated Labord lived at least 20 minutes after the impact with petitioner's car, and he testified immediate medical attention would have saved his life.

About 7:00 a.m., one of petitioner's neighbors noticed petitioner's white Honda Civic parked in its parking space with a blanket thrown over the hood. Around 9:00 a.m., petitioner telephoned Adela Diaz, his car insurance agent to report that his car had been vandalized overnight. He said the hood had been dented and he needed to get it repaired. Petitioner told Diaz, "he wanted to get things done as fast as possible and he wanted to settle the claim right away . . . ."

Throughout that day, the neighbor who had first noticed the blanket on petitioner's Honda watched him repeatedly return to his car, move the blanket, and rub the exterior. That evening, she watched a television news report about a hit-and-run accident in an area she recognized. The report included a description of the suspect car and mentioned that the car would have front-end damage due to circumstances of the collision. The neighbor became suspicious because the description of the suspect car matched petitioner's car and she decided to talk to petitioner about it.

Petitioner was outside his apartment so the neighbor went outside and asked petitioner, "Que pasa con tu caro?" Petitioner looked at her, but did not respond. She said, "Did you get into an accident?" This time, petitioner replied, "Si." The neighbor asked petitioner if he got hit at the Block in Orange, the general area where Labord was hit, and petitioner said, "Yes." At this point, another man told petitioner to be quiet and come inside his apartment. The neighbor returned to her apartment and called the police.

The responding police officer talked to the neighbor, then looked at petitioner's car, and saw that it had front-end damage, a caved-in windshield, a damaged hood, and a broken headlamp. He also noticed the car smelled like bleach. At this point, the officer called for assistance. The resulting investigation yielded considerable inculpatory evidence. Labord's blood was found on petitioner's shoes, one sock, and other items of his clothing. His blood was also detected on the car's broken rearview mirror, hood and parts of the interior. Officers found a bottle of bleach and a bucket in petitioner's apartment. Tire tracks found near Labord's body were consistent with the tread wear pattern of the tires on petitioner's car, and a hubcap found at the point of impact matched the hubcaps on petitioner's car.

At trial, the prosecution introduced evidence of a second hit-and-run incident involving petitioner and another cyclist that occurred in May 1999. An eyewitness testified the driver of a small white car veered into the bike lane and hit a cyclist from behind without warning. A police officer testified petitioner's sister told him that petitioner confessed to her that he hit a cyclist in May 1999. However, she denied making this statement at trial and said her brother never confessed to her.

*Defense evidence*

Petitioner did not testify at trial. Modesto Hernandez, petitioner's father, testified about his son's behavior and mental health history. Hernandez first noticed behavioral changes in his son in 1994. According to Hernandez, his son had been hospitalized and placed on medication at the time. The medication seemed to help him, but petitioner did not like taking his

medication and moved out of the family home about one month before the collision so he could stop taking medication. Hernandez testified that he did have some concern about petitioner driving when he was not taking his medication, but he also testified petitioner had been driving normally earlier on the day of the Labord hit-and-run.

Petitioner's treating psychiatrist, Dr. Jairo Gomez, testified petitioner suffered from "a psychosis . . . most likely paranoid schizophrenia." Gomez prescribed several antipsychotic medications during the time he treated petitioner, but petitioner complained of side effects such as drowsiness, reduced response times, restlessness, involuntary muscle spasm, and lack of coordination. Gomez testified petitioner's condition improved from his first treatment of petitioner in 1996 until April 1997. After a brief period of instability in 1997, petitioner again attained relative stability in early 1998. However, the last time Gomez saw petitioner in September 1998, petitioner complained about problems with his medications and then failed to appear for his next scheduled appointment. Gomez testified petitioner would have run out of his medications sometime in November 1998. In February 1999, petitioner was hospitalized for bizarre and threatening behavior.

Gomez testified petitioner was probably in an acute phase of his psychosis in February 1999. He conceded it is possible for a person in an acute phase of psychosis to plan and premeditate his actions, but not necessarily form specific intent. Gomez testified petitioner's condition was genuine, and not malingering.

*Rebuttal evidence*

Rogers, who was appointed by the court to evaluate petitioner's mental status at the time of the incident, reviewed petitioner's medical and other relevant records dating back to 1996. She also reviewed more recent records, including the competency evaluations and records from petitioner's nearly year-long stay at Patton State Hospital. Based on her review, Rogers testified that at his most deeply disturbed, petitioner became angry, hostile, and combative. At times, he would not recognize or acknowledge family members and did not know where he was. Petitioner had been known to aimlessly wander about without any identification for several days at a time. He often refused to contact his family. In 1995, Anaheim police officers found him naked and hiding in a dumpster. However, Rogers testified, petitioner exhibited none of these behaviors in the days leading up to the day of the Labord hit-and-run. Further, Rogers opined even deeply decompensated persons are able to engage in "goal-directed conduct."

*Sanity phase*

The jury heard testimony from four expert witnesses during the sanity phase. D'Angelo testified on petitioner's behalf. The prosecution called Sharma, Wallstrom, and Rogers. The court initially appointed Sharma and D'Angelo to evaluate petitioner's competency to stand trial. Wallstrom interviewed and tested petitioner during his involuntary commitment at Patton State Hospital. Rogers reviewed the competency evaluations and relied on them, at least in part, to form her opinion of petitioner's mental state in the guilt trial.

D'Angelo testified petitioner had a significant mental illness and "most likely did meet the legal standards for insanity" at the time he hit Labord. D'Angelo based his opinion on petitioner's extensive history with the Orange County Mental Health Agency, his possible exposure to toxic chemicals during previous employment, and a fall of approximately 16 to 18 feet with head trauma and possible loss of consciousness. According to D'Angelo, petitioner's family provided a home for him as long as he took his medication. However, petitioner left home approximately one month before he hit Labord so he could stop taking medication. Further, even when petitioner lived in his own apartment he was not fully independent. His family continued to provide meals, laundry, and maid services.

D'Angelo opined petitioner's illness "wasn't there just to buttress some sort of defense." Rather, it was an illness of long standing. D'Angelo acknowledged petitioner struggled with taking his medication, but he stated this is a common problem with psychiatric patients. According to D'Angelo, petitioner lacks insight into his mental illness and prefers to focus on his physical ailments. Petitioner's actions were consistent over time and with other psychiatric patients D'Angelo has treated. In D'Angelo's opinion, the fact petitioner did not take Labord to a hospital "implie[d] very, very impaired judgment[,] somebody who is very confused and doesn't know what he was doing as opposed to, as I said, somebody calculating how to cover this up."

Wallstrom, who needed to use a Spanish interpreter to speak to petitioner, testified petitioner "had a great deal of difficulty giving me the most basic history. There were very long pauses as he gave answers to the date of his own birth, where he was born, his parents' names, the current date and year. [¶] Questions such as what is two plus two, what is nine minus three, he was giving long answers to. And, his claims of symptoms were very, very unusual. And he was claiming a variety of symptoms that—that just made it seem curious and doubtful."

Wallstrom subjected petitioner to a number of tests, including the Test of Memory Malingering or TOMM test and the Validity Indicators Profile test. Wallstrom believed petitioner intentionally scored poorly. On the Validity Indicators Profile test, of the eight primary scales that would indicate rare, unusual, or absurd symptoms and probable malingering, petitioner scored in the definite range in five scales and in the probable range in the remaining three scales. Wallstrom testified, "I believe that he met the criteria for malingering because, first, he could not have obtained the scores on the tests that I gave him without doing so intentionally. Those had to be intentionally produced wrong answers." However, Wallstrom testified he could not adequately assess the authenticity of petitioner's mental illness due to petitioner's ability to implement his "malingering strategy."

Sharma, who also needed the assistance of a Spanish interpreter to communicate with petitioner, conceded petitioner "has a mental problem." Nevertheless, he testified, "I at that time believed that he was faking or malingering mental incompetency and mental illness." Sharma reviewed many reports, including the Patton State Hospital records, before evaluating petitioner's sanity. Sharma testified, "I believed at the time of the crime . . . [petitioner] was not suffering from a mental illness of the kind which will cause him not to be able to know the nature and quality of his act or not to be able to distinguish right from wrong. [¶] More simply speaking, I felt based on the information I had, he knew what he was doing and he knew what he was doing would be considered wrong by himself, by the law, and was morally wrong." He based his opinion on petitioner's frequent response to questions with, "I don't know," "I don't remember," or "I was insane." Sharma viewed the facts of the crime as supporting the conclusion petitioner understood the nature of his actions and had the ability to engage in organized thought.

Rogers, who also relied on the assistance of a Spanish interpreter, believed petitioner used language to avoid cooperating with people: "If he was spoken to in English, he would speak in Spanish. If he was spoken to in Spanish, he would respond in English . . . ." Petitioner did not cooperate with Rogers during an attempted in-person interview with an interpreter and he refused to answer her questions about the crime. She administered a test designed to reveal malingering and testified petitioner responded in a way consistent with malingering. Although Rogers testified it was her opinion petitioner understood "what he was doing was illegal and wrong," she conceded it was "very rare not to have a statement [from petitioner], not to have given anybody a statement. So this is the case where we have been forced to rely on what we have."

Rogers summarized petitioner's symptomology as follows: "When he was in workers' comp cases, he tended to complain very heavily about so many

symptoms that one doctor at least said that it didn't make any sense. He also complained of mental symptoms. [¶] But, when he started at Orange County Mental Health, then he was prone to deny the mental symptoms and to say that there was nothing wrong with him. But, then as time went on, and particularly when this case came into being, his strategies of presentation seemed to change. [¶] At the time he was arrested he told doctors at the jail it was mistaken identity. And then, he told people he wasn't there. And at various times he said somebody had borrowed his car keys, or that his car was vandalized, and he reportedly made a false report about being vandalized. And he was tending to say at the beginning 'I am not mentally ill,' and then he switched to 'I am mentally ill, I am incompetent, I am insane.' [¶] Those are very unusual words for a patient to use. Then, he switched to 'I don't remember. I don't remember anything.' And then, in my exam he said, 'I did nothing wrong, but I am insane and incompetent.' "

## II

## DISCUSSION

Petitioner argues permitting Wallstrom, Sharma, and Rogers to testify at the sanity trial regarding statements he made during competency evaluations and during his involuntary hospitalization violated the judicially declared rule of immunity announced in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61] (*Tarantino*) and adopted by the California Supreme Court in *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*), and his Fifth Amendment privilege against self-incrimination. The Attorney General asserts petitioner waived the issue by failing to make an appropriate objection at trial. Petitioner acknowledges trial counsel's failure to make a timely, specific objection at trial, but contends trial counsel's error constitutes ineffective assistance of counsel.

■ "The standards for ineffective assistance of counsel claims are well established. 'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' [Citation.] To establish a meritorious claim of ineffective assistance, defendant 'must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations].' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 261 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

■ "Because after a conviction it is all too easy to criticize defense counsel and claim ineffective assistance, a court must eliminate the distorting effects of hindsight by indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citations.]' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 158 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

The Attorney General acknowledges the absence of any reasonable tactical explanation for trial counsel's failure to object, and for good reason. In accordance with petitioner's burden of proof (*People v. Maury* (2003) 30 Cal.4th 342, 389 [133 Cal.Rptr.2d 561, 68 P.3d 1]), appellate counsel submitted the declaration of Mark Stephen Smith, petitioner's trial counsel. In his declaration, Smith stated, "During the trial of the charges in the above-referenced case, I did not object to the testimony of Dr. Wallstrom, Dr. Sharma, and Dr. Rogers, although that testimony rested in substantial portion on examinations of Mr. Hernandez conducted to evaluate his competency to stand trial. *I had no tactical reason for not objecting to the testimony. I was unaware that statements of a defendant and the fruits of those statements elicited during competency examinations are inadmissible at the trial of the charges.* It was not my intention that Mr. Hernandez waive, or be deemed to have waived, his privilege against self-incrimination." (Italics added.)

Notwithstanding trial counsel's admission, the Attorney General argues petitioner suffered no prejudice as the result of counsel's failure to object because "any objections based on *Arcega* would have been overruled on the grounds that it was invited [error] or that defense counsel opened the door to such testimony," and that the evidence overwhelmingly supports the jury's sanity verdict.[3]

The Attorney General's first assertion is based on inapt authority discussing the use of competency statements at trial for the purpose of impeaching a testifying defendant. Petitioner did not testify at either the guilt or sanity trial. In any event, the California Supreme Court has recently decided this issue adversely to the Attorney General's position. (*People v. Pokovich* (2006) 39 Cal.4th 1240 [48 Cal.Rptr.3d 158, 141 P.3d 267].) Further, arguing defense

---

[3] If petitioner had preserved his Fifth Amendment claim for review, we would review the error in admitting the evidence under the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Arcega, supra,* at p. 525; see also *People v. Huggins* (2006) 38 Cal.4th 175, 249 [41 Cal.Rptr.3d 593, 131 P.3d 995] [applying the *Chapman* standard to a Sixth Amendment claim of improper impeachment of defense expert with evidence gleaned from defendant's competency examination].)

counsel invited the error and/or opened the door for the admission of otherwise inadmissible testimony does not address petitioner's claim of prejudice. The second assertion requires an evaluation of the probable effect of inadmissible mental competency evaluation and testing evidence on petitioner's case for insanity in light of the relevant legal authorities, beginning with *Tarantino*.

In *Tarantino, supra*, 48 Cal.App.3d 465, the petitioner refused to submit to a psychiatric examination to determine his competency under section 1367 et seq. unless accompanied by his attorney. (48 Cal.App.3d at p. 468.) The petitioner contended the examination violated his right to counsel as well as his Fifth Amendment right to be free from self-incrimination. (48 Cal.App.3d at p. 469.) The appellate court concluded no violation of the privilege against self-incrimination would result by "compelling a defendant to submit to examination by court-appointed psychiatrists under section 1367 et seq., at least under a judicially declared immunity reasonably to be implied from the code provisions." (*Ibid.*) With the principle of a judicially declared immunity in place, the court expressed "no hesitancy in declaring that neither the statements of petitioner to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of petitioner's guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470.)

The California Supreme Court specifically approved of the *Tarantino* court's judicially declared rule of immunity in *Arcega, supra*, 32 Cal.3d 504. There the court appointed a psychiatrist to examine the defendant after he entered a plea of not guilty by reason of insanity. However, the psychiatrist recommended the defendant undergo a competency evaluation after his initial appointment because the defendant was "so psychotic." (*Id.* at p. 521.) Later, the court appointed the same psychiatrist to evaluate defendant's competency. (*Ibid.*) During a later examination, the defendant provided a detailed account of the crimes, and the competency examination formed the basis of the psychiatrist's opinion the defendant had the capacity to form the requisite mental states for the crimes charged, and that the defendant had been feigning mental illness to avoid trial. (*Ibid.*)

■ The Supreme Court held the psychiatrist's testimony "violated the rule of *Tarantino* that 'neither the statements of [a defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [an individual's] guilt . . . .' [Citation.]" (*Arcega, supra*, 32 Cal.3d at p. 522.) The Supreme Court went on to explain, "[t]his rule is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination. The rule also fosters honesty and lack of restraint on the accused's part at the examination and thus promotes accuracy in the psychiatric evaluation. Hence, the rule protects

both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent." (*Ibid.*) The court also concluded the admission of the psychiatrist's testimony violated the federal Constitution as well as state law, under the United States Supreme Court's holding in *Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866]. (*Arcega, supra,* 32 Cal.3d at p. 523.)

■ The *Arcega* rule has been repeatedly endorsed. (*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 42 [11 Cal.Rptr.3d 533] [contrasting the compelled nature of competency proceedings with mental retardation proceedings under section 1376]; *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 504 [122 Cal.Rptr.2d 673] [defendant may not refuse to participate in court-ordered competency evaluations because the judicially declared rule of immunity provides necessary assurance an accused will not be convicted nor his or her sentence enhanced on the basis of statements]; *People v. Harris* (1987) 192 Cal.App.3d 943, 949 [237 Cal.Rptr. 747] [on retrial, prosecution must use psychiatrist or psychologist other than those who examined defendant to evaluate his competency to stand trial].) Further, the judicially declared rule of immunity prohibits statements made in a competency evaluation from being used in either the guilt or sanity phase of a defendant's trial. (*People v. Weaver* (2001) 26 Cal.4th 876, 961 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*).)

In *Weaver, supra,* 26 Cal.4th 876, the court appointed two psychiatrists, Dr. Cutting and Dr. Criswell, to examine the defendant and render opinions as to his competency and sanity. At trial, Cutting and Criswell testified in addition to three other prosecution experts during the sanity phase of the defendant's trial. While defense counsel expressed some concern over the dual use of their opinions at the sanity phase, counsel did not make a specific objection on the grounds the testimony violated the defendant's privilege against self-incrimination or the *Arcega* rule. Moreover, the defendant called 14 expert witnesses on his own behalf during the sanity phase.

On appeal, the defendant argued the court's appointment of Cutting and Criswell in their dual capacities violated his Fifth Amendment right to be free from compelled self-incrimination. The California Supreme Court agreed the psychiatrists' testimony was inadmissible, but because defense counsel failed to object on proper grounds, the issue had been waived for appeal. Nevertheless, considering the issue of prejudice due to ineffective assistance of counsel, the court stated the following: "Numerous expert witnesses testified at the sanity phase of trial and several of them . . . expressed the opinion that defendant was not insane or did not suffer from a mental disease or defect. Neither Dr. Cutting nor Dr. Criswell learned information from defendant during their competency examinations that was not available to the other

expert witnesses in their respective examinations of defendant. Although defendant argues 'it is easy to see how [the] corroborating testimony [of Drs. Cutting and Criswell] tipped the scales and hurt [defendant] irreparably' at the sanity phase, the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes. The further revelation from Dr. Criswell that defendant posed a danger in the future was no doubt unsurprising to the jury given the facts of the case and was not the 'highly inflammatory' information defendant claims it to be. [¶] Moreover, the testimony of Drs. Cutting and Criswell was not uniformly negative. Although Dr. Cutting concluded defendant was not insane, he testified defendant suffered from a schizoid personality disorder and that defendant probably did experience hearing voices in his head. Dr. Criswell testified defendant endured an 'extremely pathological family,' which could have formed the basis of his developing a mental condition as an adult. [¶] We thus conclude that while permitting Dr. Cutting and Dr. Criswell to testify at the sanity phase was error, the error was not preserved for appeal, nor was counsel constitutionally ineffective for failing to object. [Citations.]" (*Id.* at pp. 961–962.) Thus, the court concluded there was no reasonable probability of a more favorable result had the court properly excluded the inadmissible testimony of Drs. Cutting and Criswell. (*Id.* at pp. 962–963.)

Here, the prosecution called three expert witnesses at petitioner's sanity trial, Sharma, Wallstrom, and Rogers. Sharma formed his opinion petitioner "was faking or malingering mental incompetenc[e] and mental illness" during his competency evaluation as demonstrated by his responses to questions from either counsel. He consistently referred to petitioner's statements during the competency evaluation throughout his testimony and formed his opinion petitioner "knew what he was doing" from the competency evaluation. At most, Sharma would allow petitioner had a mental problem.

The entirety of Wallstrom's testimony, over 40 pages of reporter's transcript, pertained to his interviews and tests conducted while petitioner was an involuntary patient at Patton State Hospital. Wallstrom's opinion of petitioner's sanity, like Sharma's, is based entirely on petitioner's responses to questioning during involuntary competency evaluations. Wallstrom testified, "[petitioner] met the criteria for malingering because, first, he could not have obtained the scores on the tests that I gave him without doing so intentionally. Those had to be intentionally produced wrong answers. [¶] There is certainly the external incentive. He has very serious charges, and he clearly did not—did not want to go to court. And, his symptoms on the face of them were implausible." Wallstrom felt he could not assess petitioner's mental state due to his "malingering strategy."

Rogers was appointed to examine petitioner's mental status in relation to his plea of not guilty by reason of insanity. Consequently, her testimony was not solely based on records from the competency evaluations. However, she testified that she "use[d] every bit of information gathered by all the other doctors in this case" in forming her opinion of petitioner's sanity, and frequently referred to the observations and conclusions of the competency evaluators. The judicially declared rule of immunity applies to the defendant's statements to the psychiatrists appointed under section 1369 and to the fruits of such statements. Neither one may be used at the trial on the issue of the defendant's guilt under either the plea of not guilty or of not guilty by reason of insanity. (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at p. 498.) Rogers's review of the competency evaluation reports constitutes an impermissible use of the fruits of petitioner's immunized statements.

Petitioner's case stands in sharp contrast to the facts in *Weaver.* In *Weaver,* numerous experts gave admissible testimony on the subject of the petitioner's sanity in addition to the inadmissible testimony of two psychiatrists. Moreover, the inadmissible testimony of the two psychiatrists was not uniformly negative. One doctor concluded the petitioner suffered from "schizoid personality disorder" and the other testified the defendant had an " 'extremely pathological family.' " (*Weaver, supra,* 26 Cal.4th at pp. 961–962.)

In this case, the prosecution's expert witnesses gave uniformly negative testimony diagnosing petitioner's mental illness as malingering. Not one of the prosecution experts would concede petitioner had schizophrenia or some other psychosis, an arguably untenable position in light of the testimony from petitioner's treating physician and the evidence of petitioner's repeated hospitalizations. At most, the prosecution experts would concede some type of a mental illness or personality disorder could not be ruled out, but only because petitioner's malingering made a definitive diagnosis difficult. Apparently, the fact petitioner did poorly when he had to communicate through interpreters may also have contributed to this difficulty.

Moreover, D'Angelo, petitioner's own expert witness, had also been appointed under section 1369. His testimony at the sanity phase was consequently inadmissible, and it was not universally helpful to the defense. On the one hand, he reviewed petitioner's medical history and interviewed petitioner's various family members. Based on a comparison of petitioner's medical history, his behavior a few days before the incident, and the facts of the crime, D'Angelo testified petitioner did not understand the nature of his actions or that what he did was wrong, and he opined petitioner was "decompensated."

On the other hand, under cross-examination, D'Angelo became argumentative and nonresponsive. The court sustained several of the prosecutor's

objections on both grounds. D'Angelo admitted he did not review pertinent records, and he made several references to the inadmissible competency evaluation. At one point the prosecutor asked, "[I]sn't it true that when you talked to the petitioner about the crime, that you also had the opinion that you didn't know where his mental illness stopped and where his lying began?" D'Angelo replied, "That was during the . . . competency evaluation, I had difficulty with that, yes?" The prosecutor also elicited statements about the crime through D'Angelo's testimony. D'Angelo testified petitioner consistently denied hitting Labord and claimed someone had vandalized his car. Thus, the testimony of petitioner's own expert witness was both inadmissible and prejudicial.

The Attorney General contends Wallstrom's testimony falls outside the *Arcega* rule because he was not appointed to evaluate petitioner's competency under section 1369. We disagree.

■ Petitioner's statements to Wallstrom occurred during interviews and testing conducted while petitioner was an involuntary patient confined at Patton State Hospital pursuant to section 1370, subdivision (a)(1)(B)(i). We have found no published case refusing to extend *Arcega*'s judicially declared rule of immunity in competency proceedings to employees of health facilities charged with restoration of a criminal defendant's competency under section 1370. In addition, the Attorney General submitted a declaration from Wallstrom in which he stated that his custom and practice is to advise patients that their participation at Patton State Hospital is voluntary, but that their interviews and test results will be documented and possibly subpoenaed by the court. Nevertheless, we are not persuaded this renders the proceedings at Patton State Hospital, or any other facility listed in the statute, voluntary or outside the protection of the Fifth Amendment.

The purpose of section 1370, subdivision (a)(1)(B)(i) is the defendant's "speedy restoration to mental competence" with the ultimate goal of a trial on the merits and a judgment. (§§ 1370.01, 1372.) Because a criminal trial looms at the end of the average defendant's commitment, competency evaluators employed by mental health facilities, like Wallstrom, must be governed by the *Arcega* rule. The extension of the rule to these health care professionals is both necessary and logical for the same reasons the California Supreme Court adopted the rule in the first place, "to ensure that an accused is not convicted by used of his own statements made at a court-compelled examination . . . [to] foster[] honesty and lack of restraint on the accused's part at the examination and thus promote[] accuracy in the psychiatric evaluation. Hence, the rule protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent." (*People v. Arcega, supra*, 32 Cal.3d at p. 522.) Therefore, we conclude

Wallstrom's testimony, like that of Sharma, Rogers and D'Angelo was inadmissible on the issue of petitioner's sanity.

In *Weaver, supra,* 26 Cal.4th 876, the court concluded counsel's failure to object did not result in prejudicial error. (*Id.* at p. 962.) The court observed, "the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes." (*Id.* at p. 961.) In petitioner's case, the jury began its deliberations during the afternoon session on February 2, 2004. Within hours, it submitted a written request for a readback of the following testimony: (1) Dr. D'Angelo's initial testimony on January 29; (2) Dr. Wallstrom's initial testimony on January 29; and (3) the testimony given by Dr. Gomez on January 26. The next day, the jury submitted a request for all of Dr. D'Angelo's testimony from January 29 and February 2. The jury deliberated all day February 4 and reached its verdict the following day.

In sum, the jury requested readbacks of the testimony of three important witnesses: Gomez, petitioner's treating physician, who had testified during the guilt trial; D'Angelo, a defense expert witness at the sanity trial, whose testimony was inadmissible and not wholly beneficial to the defense; and Wallstrom, whose testimony was entirely detrimental to petitioner's case and also inadmissible. The Attorney General further argues petitioner suffered no prejudice from any of this inadmissible testimony because he did not make any statements about the facts of the crime. We are not convinced by this contention.

■ First, D'Angelo testified petitioner consistently denied hitting Labord and claimed his car had been vandalized. Consequently, there was evidence concerning the crime from one of petitioner's competency evaluations introduced at trial. Second, while the basis for *Arcega*'s judicially declared rule of immunity in mental competency proceedings is the Fifth Amendment, its application is not limited to inculpatory statements about the facts of the crime. "The California rule of judicial immunity is broader than the federal rule for compliance with the Fifth and Sixth Amendments. [Citation.]" (*Centeno v. Superior Court, supra,* 117 Cal.App.4th at p. 42.) In fact, at the sanity trial, the underlying crime is relevant only in so far as it explains the defendant's ability to understand the nature and quality of his acts or distinguish right from wrong.

■ In *People v. Jablonski* (2006) 37 Cal.4th 774 [38 Cal.Rptr.3d 98, 126 P.3d 938], the defendant argued the immunity in *Arcega* did not go far enough. He contended the prosecution could make "derivative uses" of his statements, which might include insight into defense trial strategy, the

attorney-client relationship, or other matters helpful to the prosecution at trial. (*Id.* at p. 802.) The defendant's concern for the "nonevidentiary" use of his statements could not have been based solely on inculpatory statements regarding the crime. In any event, the *Jablonski* court stated, "the immunity granted in *Arcega* fully protects a defendant against any nonevidentiary uses of statements obtained from the defendant during the competency hearing to the same extent he or she is protected by the privilege against self-incrimination." (*People v. Jablonski* (2006) 37 Cal.4th 774, 803 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

■ The court in *Tarantino, supra*, 48 Cal.App.3d 465, acknowledged the practical effect on criminal proceedings of enforcing the judicially declared rule of immunity in competency proceedings. The court stated, "We recognize that this immunity normally will require that the psychiatrists appointed for examination under section 1367 et seq. be other than those appointed for inquiry under section 1026." (*Tarantino, supra*, 48 Cal.App.3d at p. 470.) The rule is simple enough. "A psychiatrist appointed to examine a defendant for competency may not subsequently testify on the issues of the defendant's guilt, sanity, or penalty. [Citation.]" (*Centeno v. Superior Court, supra*, 117 Cal.App.4th at p. 42.) The fruit of the defendant's competency evaluations, i.e., the competency expert's impressions, reports or the results of the evaluator's testing, are not to be made available to experts appointed to testify on the issues of the defendant's guilt, sanity, or penalty.

In this case, despite abundant evidence of malingering, the jury believed the issue of petitioner's sanity to be a close case. Because the jury considered this to be a close case notwithstanding the overwhelming amount of inadmissible and unfavorable evidence it considered, we conclude petitioner has met his burden of demonstrating a reasonable probability of a more favorable result absent counsel's error. Thus, petitioner is entitled to a new trial on the issue of his sanity.

■ We have reviewed petitioner's claims of error relating to the guilt trial and found none requiring a reversal of the guilt verdict. Therefore, a new trial on petitioner's sanity may proceed without a new trial on the issue of his guilt. (*People v. Marshall* (1930) 209 Cal. 540, 547 [289 P. 629]; *People v. McCowan* (1986) 182 Cal.App.3d 1, 20 [227 Cal.Rptr. 23].) In addition, section 1026 permits the trial court to empanel a different jury to hear the new sanity trial. (*People v. Nesler* (1997) 16 Cal.4th 561, 590 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

## III

## DISPOSITION

The judgment is reversed. The case is remanded for a new trial solely on the question of petitioner's sanity. The verdicts from the guilt trial remain in full force and effect pending the outcome of the sanity trial. Upon finality of this opinion, the clerk of this court shall submit a copy of this opinion to the State Bar of California. (Bus. & Prof. Code, § 6086.7, subd. (a)(2); *In re Jones* (1996) 13 Cal.4th 552, 589, fn. 2 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

O'Leary, Acting P. J., and Ikola, J., concurred.

A petition for a rehearing was denied October 27, 2006.