Filed 10/25/21  P. v. Burns CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KENNETH DWAYNE BURNS,<br><br>Defendant and Appellant. | F078505<br><br>(Kern Super. Ct. No. BF165297A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on September 29, 2021, be modified as follows:

1. On page 25, footnote 6, beginning "We disagree with" is deleted and the following footnote is inserted in its place:

    **6** The judicial immunity accorded to defendant's statements to a competency expert will normally require that experts appointed for competency examinations not testify at trial regarding any mental issue.  (See *Tarantino v. Superior Court*, *supra*, 48 Cal.App.3d at p. 470.)  *Hernandez* extended this rule to bar testimony from any expert who has reviewed the "fruit of [ ] defendant's competency evaluation," including reports.  (*Hernandez*, *supra*, 143 Cal.App.4th at p. 477.)  While this may be the practical result in most cases, as we discuss below, we disagree with *Hernandez* to the extent it can

be read as holding that the Fifth Amendment requires exclusion of testimony by any expert who has been exposed to defendant's competency statements or the fruit of those statements.

2. At the end of the first paragraph on page 28, after the sentence ending "therein as a basis for his opinion or testimony," add as footnote 8 the following footnote, which will require renumbering of all subsequent footnotes:

> [8] We are not persuaded by defendant's argument that Dr. Longwith's expert opinion "used" the competency report just by discussing it within his own report.

There is no change in the judgment.  Except for the modifications set forth, the opinion previously filed remains unchanged.

Appellant's petition for rehearing filed on October 14, 2021, is denied.

HILL, P. J.

WE CONCUR:


DETJEN, J.


FRANSON, J.

2.

Filed 9/29/21  P. v. Burns CA5 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>KENNETH DWAYNE BURNS,<br><br>　　　Defendant and Appellant. | F078505<br><br>(Super. Ct. No. BF165297A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett and Barbara A. Lane, Judges.[†]

C. Athena Roussos, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Doris A. Calandra, William K. Kim, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[†]　　　Judge Lane ruled on the motion to quash/suppress prior to the original date set for trial. Judge Schuett presided over the sanity court trial and sentencing.

## INTRODUCTION

Defendant Kenneth Dwayne Burns robbed a bank in 2016. After the trial court denied his motion to quash the search warrant and suppress evidence, defendant stipulated to the amended information charging him with robbery, false imprisonment, evading the police, and various felony enhancements. The court found defendant guilty after a court trial. During the sanity phase of his trial, defendant moved to exclude the testimony of the prosecution's sanity expert who had reviewed defendant's mental competency report prepared earlier in the proceedings. The trial court denied the motion and ultimately found defendant sane at the time of the offenses. Denying probation, the trial court sentenced defendant to 50 years to life, plus 22 years, including four separate five-year prior serious felony conviction enhancements under Penal Code section 667, subdivision (a)(1)[1] and two 1-year prior prison term enhancements under section 667.5, subdivision (b).

Defendant raises the following issues: (1) the trial court erred in denying his motion to suppress evidence seized pursuant to a warrant issued based upon an affidavit that failed to establish probable cause; (2) the trial court erred during his trial's sanity phase by admitting testimony from the expert who reviewed defendant's mental competency examination report, thereby permitting use of his immunized statements in violation of the Fifth Amendment; (3) the trial court erred in enhancing his sentence based on two prior serious felony convictions that had not been brought and tried separately pursuant to section 667, subdivision (a)(1); (4) we should remand to permit the trial court to consider whether to strike his prior serious felony conviction enhancements in light of Senate Bill No. 1393; (5) we should strike the robbery fine (§ 1202.5), the court operations assessment (§ 1465.8), and the court facilities assessments (Gov. Code, § 70373) because the trial court imposed them without considering his ability to pay, and

---

[1] All statutory references are to the Penal Code unless otherwise noted.

we should remand for the trial court to determine whether he had the ability to pay the $300 minimum restitution fine (§ 1202.4); (6) even though section 1001.36 was in effect at the time he was sentenced, it applies retroactively to his case and requires remand or, in the alternative, his counsel was ineffective in failing to request mental health pretrial diversion; (7) we should remand to permit the trial court to strike the one-year prior prison term enhancement under section 667.5, subdivision (b) considering Senate Bill No. 136.

The People concede the issues relating to enhancements for prior convictions and, because such concessions will result in remand for resentencing, agree defendant should be permitted to request that the trial court consider his ability to pay before imposing any fines, fees, or assessments. The People defend the trial court's decision to deny defendant's motions to suppress and to exclude testimony and argue that defendant forfeited his claim regarding the failure to request mental health pretrial diversion.

We agree with the People's positions, except for one concession. Ultimately, we remand the matter to the trial court to (1) strike two prior serious felony conviction enhancements for convictions not brought and tried separately pursuant to section 667, subdivision (a)(1); (2) consider whether to strike defendant's prior serious felony conviction enhancements in light of Senate Bill No. 1393; and (3) strike one of the one-year prior prison term enhancements under section 667.5, subdivision (b).[2] We affirm the judgment in all other respects.

## PROCEDURAL BACKGROUND

### *Preliminary Proceedings*

Originally charged by complaint, defendant was held to answer after his preliminary hearing on September 2, 2016. The Kern County District Attorney filed an

---

[2] Defendant's 1991 felony conviction for robbery was not a sexually violent offense. The prior prison term enhancement for his 1993 conviction is not affected by this appeal.

information charging defendant with robbery (§ 212.5, subd. (c); count 1), false imprisonment with force (§§ 236, 237, subd. (a); count 2), and misdemeanor resisting arrest (§ 148, subd. (a)(1); count 3). As to counts 1 and 2, the information alleged four prior "strike" convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), and two prior prison terms (§ 667.5, subd. (b)). As to count 1, the information alleged four prior serious felony convictions (§ 667, subd. (a)(1)). Defendant pled not guilty to the charges and denied all allegations in the information.

On September 15, 2017, upon motion of defense counsel, the trial court suspended criminal proceedings and appointed Dr. Dean Haddock to determine defendant's competency to stand trial pursuant to section 1368. On October 6, 2017, the court received the report of Dr. Haddock, found defendant competent to stand trial, and reinstated criminal proceedings.

Thereafter, on November 17, 2017, defendant entered an additional plea of not guilty by reason of insanity. The court appointed Dr. Thomas Middleton and Dr. Gary Longwith to examine defendant.

Defendant moved to quash the search warrant and to suppress evidence on April 3, 2018. The prosecution filed a written opposition. The court heard and denied the motion on April 12, 2018.

### Trial Proceedings

The guilt phase of defendant's trial commenced on October 9, 2018. The trial court accepted defendant's stipulation to all allegations in the amended information[3] after defendant waived his constitutional trial rights. As a result, defendant agreed that on August 19, 2016, he (1) willfully and unlawfully took personal property in the possession

---

[3]    The amended information was filed on October 9, 2018, correcting the date of one of the prior convictions to October 10, 1991.

of another, from his or her person or immediate presence and against his or her will by means of force and violence; (2) willfully and unlawfully violated the personal liberty of another by violence, menace, fraud or deceit; and (3) willfully and unlawfully resisted, delayed, or obstructed a peace officer who was discharging his or her duty. Defendant also stipulated to all special allegations, and no evidence was otherwise presented in the guilt phase of the trial. The sanity phase of the court trial was rescheduled to October 16, 2018.

At the sanity phase of the trial on October 16, 2018, defendant presented the testimony of Dr. Thomas Middleton, who attested that defendant was insane at the time of the offenses. Defendant offered no additional evidence.

The following day, the court conducted a hearing pursuant to Evidence Code section 402 to address defendant's motion to exclude Dr. Longwith from testifying at the sanity phase of the trial. Defendant had filed a motion on October 9, 2018, to exclude Dr. Longwith's testimony because the doctor had reviewed Dr. Haddock's competency report and defendant's immunized statements made in competency proceedings. The prosecution filed its opposition on October 15, 2018. The court denied the motion after hearing testimony from Dr. Longwith.

The sanity phase of the court trial continued with Dr. Longwith's testimony that defendant was sane at the time of the offenses and testimony from other prosecution witnesses. The court found that defendant was sane at the time of the offenses, adjudged him guilty on all counts, and found the special allegations to be true.

***Sentencing Hearing***

On November 28, 2018, the trial court sentenced defendant to a total term of 50 years to life, plus 22 years, including four separate five-year prior serious felony conviction enhancements (§ 667, subd. (a)(1)) and two one-year prior prison term enhancements (§ 667.5, subd. (b)). The trial court ordered defendant to pay a $10 robbery fine (§ 1202.5), a $300 minimum restitution fine (§ 1202.4, subd. (b)), $120 in

5.

court operations assessments (§ 1465.8), and $90 in court facilities assessments (Gov. Code, § 70373).

This timely appeal followed.

## DISCUSSION

### I. *The trial court did not err in denying defendant's motion to quash the search warrant and suppress the evidence seized.*

Defendant contends the trial court erred when it denied his motion to quash the search warrant and suppress the evidence seized from his motel room because the affidavit in support of the warrant failed to establish probable cause. More specifically, defendant argues that the search warrant affidavit provided no probable cause that the items to be seized were evidence of a crime. We reject defendant's arguments and affirm the trial court's denial of the motion to quash the warrant and suppress evidence.

### A. Background

On August 19, 2016, the day of the bank robbery, Detective Kenneth Sporer authored a search warrant for defendant's motel room, and Judge Brian M. McNamara signed the warrant at 5:50 p.m. The warrant authorized the seizure of firearms and related items, electronic communication devices, items establishing the individual with dominion and control over the seized items, and a DNA sample from defendant.

Detective Sporer's affidavit described his training and experience, including that he had been an officer for 19 years and was currently assigned to robbery/homicide. The affidavit detailed the circumstances of the offenses, defendant's apprehension, evidence of the robbery seized from defendant, and described the discovery of a motel key and the follow-up investigation that established the motel room belonged to defendant:

> "On 8-19-16 at approximately [3:23 p.m.] officers of the Bakersfield Police Department were dispatched to … [the] Bank, regarding a robbery that just occurred. When officers arrived on scene, they were able to confirm that a bank robbery had just occurred. The suspect in the robbery was armed with a firearm and was wearing a mask. The suspect was able

6.

to obtain an unknown amount of currency during the robbery. The bank teller also included a money tracking device with the money that was taken.

"The first patrol officers to arrive on scene were directed to the area west of the bank. Those officers responded to the area and located [defendant] in a large sump area. [Defendant] was taken into custody and was found to be in possession of a replica firearm, a clothing item with eye holes cut into it, US currency, and the tracking device from the bank.

"While searching [defendant], officers located a motel room key card in his pocket. Officers were able to recognize that the room key belong[ed] to a Motel …. There [was] a Motel … just a short distance east of where [defendant] was arrested.

"I responded to the Motel … and spoke with employees. I provided them with the room key card. They were able to confirm that the key card belong[ed] to their motel. The room key card was swiped and returns [*sic*] to room [No. ]143. They advised that the room was currently rented to [defendant].

"It is unknown at this time whether [defendant] ha[d] an accomplice or not, or if he has any additional weapons inside his motel room. I am aware that people often possess additional firearms.

"By obtaining a DNA sample from [defendant], comparisons can later be made against DNA located during this investigation."

Pursuant to the warrant, officers seized a cut-up black shirt, $121, two cellular telephones, a wallet, the receipt for the motel room, and a DNA swab from defendant.

Prior to trial, defendant moved to quash the warrant and suppress the seized evidence pursuant to section 1538.5.[4] The prosecution opposed the motion. After

---

**4**    Defendant's motion argued that the information contained within the cellular phones should also be suppressed for failing to comply with the Electronic Communications Privacy Act (§ 1546 et seq.). However, at the motion's hearing, the prosecutor acknowledged that the warrant authorized only the seizure of the cellular phones and that they had not been searched pursuant to the warrant. Defendant has not raised this issue on appeal.

hearing and considering the arguments from both sides, the trial court denied the motion as follows:

> "The detective followed up on a fluid investigation.[5]  Officers had been to the bank.  They had been to the scene of the sump where [] defendant had been located.  They found the [m]otel key on him and checked the [m]otel, where he was a renter, Room 143.  I think that's the right room number.  The warrant as a whole encompasses things used as means for committing a felony, which would include, just based on your information, the papers, the material for making the facemask that was used at the bank.  So it's a thin warrant, as warrants go, but I think it is sufficient."

## B.  Legal Principles and Standard of Review

"The Fourth Amendment to the United States Constitution prohibits 'unreasonable searches and seizures' and requires search warrants to be issued only upon a showing of 'probable cause' describing with particularity 'the place to be searched, and the ... things to be seized.'  [¶]  The pertinent rules governing a Fourth Amendment challenge to the validity of a search warrant, and the search conducted pursuant to it, are well settled.  'The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 659 (*Westerfield*).)

" 'The test for probable cause is not reducible to "precise definition or quantification." '  [Citation.]  But we have stated that it is ' "less than a preponderance of the evidence or even a prima facie case." ' " (*Westerfield*, *supra*, 6 Cal.5th at p. 659.)

"The standards for reviewing search warrant affidavits stated in *United States v. Ventresca* (1965) 380 U.S. 102 bear repetition here.  'If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants …

---

**5**      In this regard, we note that the warrant was signed at 5:50 p.m., approximately two and one-half hours after the robbery.

must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts will tend to discourage police officers from submitting their evidence to a judicial officer before acting. [¶] … [T]he courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " (*People v. Mesa* (1975) 14 Cal.3d 466, 469.)

### C. The Search Warrant Affidavit Established Probable Cause

Defendant argues that the affidavit failed to establish the items listed in the search warrant would be evidence of a crime. We disagree. The affidavit in support of the search warrant provided probable cause to believe that defendant had committed a robbery. Detective Sporer detailed the circumstances of the robbery itself and defendant's apprehension in proximity to the money taken from the bank, a mask, and the GPS tracking device placed in the money by the bank teller. These facts sufficiently established that a crime had been committed and that defendant was the perpetrator. Defendant was also arrested in possession of a motel key. Detective Sporer described that he had identified the motel that issued the key, identified the room opened by the key, and learned that defendant rented the room. Detective Sporer requested permission to search defendant's room for firearms and related items, electronic communication devices, items establishing the individual with dominion and control over the seized items, and a DNA sample from defendant. While Detective Sporer did not specifically identify why these items were evidence of a crime, he asserted that they were evidence.

9.

We believe that given the evidence that defendant committed a bank robbery and that he was staying in the motel room, common sense supports the inference that the motel room would contain evidence that defendant was planning to rob a bank and his motive for doing so.

Defendant argues that Detective Sporer's failure to articulate why electronic communication devices would provide evidence of the crime, defeats probable cause to believe that they would contain such evidence. We disagree. The issuing judge was permitted to draw his own inferences from the facts presented even if the affiant failed to articulate the inference himself. The Fourth Amendment does not prohibit the use of reasonable inferences drawn from evidence; it simply requires that such inferences be drawn by a neutral and detached magistrate. (*United States v. Ventresca*, *supra*, 380 U.S. at p. 106.) " '[P]robable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required.' " (*Andresen v. Maryland* (1976) 427 U.S. 463, 483). For example, in *Andresen*, the United States Supreme Court upheld the seizure of evidence of another related real estate fraud after concluding "that the trained special investigators reasonably could have believed that the evidence [of a separate fraud] … could be used to show [the] petitioner's intent with respect to the [fraud transaction under investigation]." (*Ibid*.)

Even without such specific articulation of the relevance of electronic communication devices, the facts set forth in the affidavit support a reasonable and commonsense conclusion that an individual engaged in a robbery likely would use electronic communication devices to obtain information regarding the bank or banks that he intended to rob as part of the planning for such a crime. Reason and common sense also support the inference that defendant could have communicated his intentions in robbing the bank to someone else or that he had assistance in planning and executing his

10.

plan to rob the bank, and that such evidence would be in his room and contained within communications found on electronic devices located in the room.

Defendant also argues that the search warrant could not request a DNA sample from defendant because no DNA analysis had yet been performed on the evidence seized from him during his arrest.  We note that the officers seized a makeshift mask and BB gun.  Such items lend themselves to a DNA analysis and defendant's DNA would be necessary for comparison.  Defendant has provided no case authority for the proposition that law enforcement may not seize a DNA sample from a defendant where evidentiary items have been seized that have not yet been subjected to DNA testing.  Considering the items seized, it is probable that DNA would be recovered, and that defendant's DNA would be evidence of his involvement in the bank robbery.

Interpreting the warrant affidavit in a commonsense, rather than hypertechnical, manner prevents us from invalidating this warrant.  Furthermore, even if we found this to be a marginal case, the strong preference for warrants requires us to resolve questions regarding probable cause in favor of the warrant.  (*United States v. Ventresca*, *supra*, 380 U.S. at p. 109; *People v. Mesa*, *supra*, 14 Cal.3d at p. 469.)  "[The California Supreme Court] explained in *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150, that the warrant 'can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause."  (W*esterfield*, *supra*, 6 Cal.5th at p. 659.)

Defendant's final argument challenges Detective's Sporer's expert conclusion that individuals who possess one firearm often possess additional firearms.  Neither party has brought to our attention any case addressing this specific issue.  Our research has found two such cases, but both involved warrants searching for evidence of individuals in unlawful possession of firearms.  (*United States v. King* (9th Cir. 2021) 985 F.3d 702, 709 [felon's possession of firearm at residence on behalf of another individual on one occasion raised an inference that the felon also possessed firearms for others and,

11.

therefore additional firearms were likely to be unlawfully possessed at his residence]; *United States v. Nora* (9th Cir. 2014) 765 F.3d 1049, 1059–1060 [observations of the defendant with one firearm did not provide reasonable grounds to believe additional firearms would be found in his residence].) However, even if we assume that the affidavit did not establish probable cause to search for additional firearms in defendant's motel room, this would not invalidate the warrant or require suppression of items seized pursuant to other categories in the warrant. It is well established that an overbroad warrant may be upheld as to valid portions where there is probable cause to seize some of the items specified in the warrant although not others. (*Aday v. Superior Court* (1961) 55 Cal.2d 789, 797.) Where a category of evidence is not supported by probable cause, we sever the invalid portion but do not otherwise invalidate the warrant. (*Aday*, at p. 797; *People v. Joubert* (1983) 140 Cal.App.3d 946, 952; see *United States v. Sears*, (9th Cir. 2005) 411 F.3d 1124, 1130; *United States v. Fulbright* (9th Cir. 1997) 105 F.3d 443, 453.) Furthermore, defendant has not identified any evidence that would have been introduced at trial pursuant to this provision of the warrant, nor could he, because no firearms were seized. Accordingly, even if we assume the firearms category was overbroad, defendant has not shown that any evidence from that category should have been suppressed. (See *People v. Farley* (2009) 46 Cal.4th 1053, 1102; *People v. Camarella* (1991) 54 Cal.3d 592, 607, fn. 7 (*Camarella*); *Aday*, at p. 797.)

### D.     The Officers Relied Upon the Search Warrant in Good Faith

"Ordinarily, the exclusionary rule—a 'judicially created remedy designed to safeguard Fourth Amendment rights'—[operates] to preclude 'the use of evidence obtained in violation' of the Fourth Amendment." (*United States v. Barnes* (9th Cir. 2018) 895 F.3d 1194, 1201.) However, under the good faith exception to the exclusionary rule, evidence seized by police officers acting "in objectively reasonable reliance on a search warrant that is issued by a detached and neutral magistrate but is later

12.

found to be invalid for lack of probable cause" need not be suppressed. (*People v. Willis* (2002) 28 Cal.4th 22, 30.) An officer's reliance is objectively reasonable if a reasonably well-trained officer would not have known that the search was illegal despite the magistrate's authorization, such as where the supporting affidavit is " ' "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ' " (*Id.* at p. 32, citing *United States v. Leon* (1984) 468 U.S. 897, 923 (*Leon*).)

In *Leon*, although the defendant asserted that no reasonable and well-trained officer "could have believed that there existed probable cause" for the search, the high court rejected that claim, observing that the searching officer had submitted to the magistrate "much more than a 'bare bones' affidavit." (*Leon*, *supra*, 468 U.S. at p. 926; see *Camarella*, *supra*, 54 Cal.3d at pp. 603, 606.) The affidavit in this case established probable cause to believe that defendant had committed a bank robbery and personal items would be in his motel room that would be useful in determining if he was working alone and in identifying the steps he took to plan the robbery. While Detective Sporer could have articulated the connection between the evidence expected to be found in the motel room and the crime more clearly, the question under *Leon* is not whether additional information would have been reasonable, but whether a reasonable officer in Detective Sporer's position would have known that the affidavit, as it existed at the time it was to be presented to the magistrate, was legally insufficient without more.

We conclude on these facts that a well-trained officer could have reasonably relied upon the warrant issued in this case because the affidavit presented a close or debatable question on the issue of probable cause. (See *Leon*, *supra*, 468 U.S. at p. 926.) Thus, it cannot be said that Detective Sporer should have known that his affidavit failed to establish probable cause (and hence that he should not have sought a warrant or executed it). We find the affidavit in this case is more than " 'bare bones,' " including enough information to permit a magistrate to reasonably infer the evidentiary value of the

requested categories of items (*ibid*.) and was not " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' " (*id*. at p. 923). We conclude the affidavit included sufficient information "to make the probable cause determination a close question for any objectively reasonable and well-trained officer, and, indeed, for reasonable judicial officers as well. ([*Id*.] at p. 926 [affidavit 'provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause'])." (*Camarella*, *supra*, 54 Cal.3d at p. 606.)

Accordingly, we conclude that even if the probable cause determination was close or debatable, Detective Sporer acted reasonably when he took the affidavit to a judicial officer for determination. His subsequent reliance on the warrant was objectively reasonable under *Leon*, and thus suppression of the evidence was not required. (See *Camarella*, *supra*, 54 Cal.3d at pp. 606–607.)

## II.     *The trial court did not err in finding that the prosecution's sanity expert did not "use" defendant's immunized competency examination or statements in his testimony.*

Defendant argues that the admission of Dr. Longwith's testimony at the sanity phase of his trial violated his Fifth Amendment privilege against self-incrimination because the doctor reviewed defendant's competency report while assessing his sanity. We find Dr. Longwith's review of defendant's immunized statements and fruits thereof did not result in the use of his immunized statements against him during trial. We reject defendant's argument and conclude the trial court properly admitted Dr. Longwith's testimony.

### A.     <u>Background</u>

#### 1.     Competency Proceedings

As previously noted, the trial court had suspended proceedings and appointed Dr. Dean Haddock to determine defendant's competency to stand trial pursuant to section 1368. Based upon Dr. Haddock's report, the trial court found defendant

14.

competent to stand trial. Dr. Haddock's report described his review of defendant's prior mental health assessments, his own competency testing, information obtained from defendant regarding his mental health history, and defendant's statements regarding the offense. Defendant's statements to Dr. Haddock included the following:

> "I had never been on Seroquel before … I was staying in a Men's Home at the time … I woke up hallucinating after taking the Seroquel and the voices told me my roommate was the devil and he was going to kill me … The voices told me the house I was living in was going to blow up so I ran out … I found myself on … Avenue … The voices told me to go to the bank and get some money … I was supposed to get exactly $10,000 and donate the money to a church or a homeless shelter or my family would die … Next thing I know when I came to my head was busted open and my knee was hurting … I asked to be single celled when I got to jail … If I had it to do again I would not have taken the Seroquel."

### 2. Dr. Longwith's Report—Prosecution Expert

Thereafter, defendant entered an additional plea of not guilty by reason of insanity and the trial court appointed Drs. Middleton and Longwith to examine defendant. Dr. Longwith's report described his approximately two-hour interview and evaluation of defendant. Regarding the offense, defendant's account to Dr. Longwith was more detailed than that provided to Dr. Haddock and included information that defendant had been evicted from the men's home and was staying at a motel at the time of the robbery. Defendant made statements to Dr. Longwith regarding the day of the robbery:

> "… Defendant stated he picked up his medication 2-3 days before the offense[s] and started the new medication on the 14th of August 2016. He then began to hear voices and he saw demons. That evening his roommate work [sic] him up and [] Defendant responded by throwing a 'dumbbell' at him and then began to punch and kick him. The manager of the Men's home kicked him out in the early morning hours (2-3 AM). [] Defendant then met with social services later that day or the next, got money, and asked to be placed in a new Men's home. In the meantime [] Defendant secured a motel room to live. He described the intensity of the voices at that time to be off and on. He continued his medications, to include the Seroquel, and he telephoned his doctor's office on the day of the offense, but the psychiatrist was not available. The voices then began to tell him the

15.

motel he lived in would blow-up. He ran out of the motel.  The voices then told him his family was going to die.  The voices continued, if he didn't want his family to die he had to go [to] the bank and get $10,000 dollars and donate that many [*sic*] to a church.  [] Defendant recalled going to the Bank, but he does not recall going inside, having a weapon, taking the money, or leaving the bank.  He stated the next thing he could recall was sitting in the police car feeling dizzy and later talking with the police.  I asked if he gave the officers a statement.  He stated he did.  [] Defendant stated he told the officers about the voices, and the fact the voices told him he had to get $10,000 dollars and donate it or his family would be killed."

The report reflects that Dr. Longwith compared defendant's statements to him with statements to Dr. Haddock, noting that while defendant told Dr. Haddock the voices threatened to blow up the men's home, he told Dr. Longwith that the voices threatened to blow up the motel room.  Dr. Longwith's report concluded that defendant was sane at the time of the offense.  Dr. Longwith found it unusual that while defendant claimed to have a clear recall of the events preceding and following the robbery, he could not remember the robbery itself.  While defendant claimed to have told the officers he was hearing voices, the police reports did not support his statement.  The reports reviewed by Dr. Longwith did, however, include defendant's statement to an officer that defendant thought he had obtained more money from the robbery than what had been recovered.  Dr. Longwith believed that defendant's statement to the officer regarding the amount stolen was inconsistent with having no memory of the robbery and with having told the officer defendant was hearing voices.  Given these inconsistences and the several test results showing that defendant was malingering, Dr. Longwith did not believe that defendant had been hearing voices at the time of the robbery and, therefore, found he was sane at the time of the offense.

### 3.    Sanity Phase—Defense Evidence

The defense called Dr. Thomas Middleton, who testified that he prepared for defendant's evaluation by reviewing defendant's criminal history, the police reports for the current offenses, and several mental health evaluations and assessments of defendant

prepared prior to the offenses in 2015 and 2016. He interviewed defendant, obtaining information concerning defendant's psychiatric history and prescribed medications. Defendant said he experienced psychotic symptoms dating from when he was a juvenile and had taken medication for decades. His mother also suffered from mental illness.

In Dr. Middleton's opinion, defendant's symptoms were cycling, and defendant appeared to be showing increasing paranoia, hallucinations, and instability. Dr. Middleton concluded that at the time of the offense, defendant was under a delusional belief that if he did not obtain $10,000, his family would be harmed.

Dr. Middleton concluded that defendant was insane at the time of the offenses and that while defendant understood the nature and quality of his actions, he did not understand that they were wrongful. Specifically, defendant believed that it was essential and imperative that he rob the bank because defendant said he believed that the devil would kill him and cause harm to his family unless he provided $10,000.

When cross-examined, Dr. Middleton testified that defendant's statement—the devil would kill defendant and harm his family if he did not provide $10,000 to the devil—was the only basis for concluding defendant was insane at the time of the offense. Dr. Middleton testified that he diagnosed defendant with a schizoaffective disorder based on his mental history, and that defendant may experience hallucinations, delusions, and depression. However, he also testified that individuals with such a mental condition could be completely sane and culpable. According to defendant's medical records, he was first diagnosed with the disorder by an intern at Kern County Mental Health and had a history of suicidal thoughts but had never reported auditory hallucinations that commanded him to commit other types of crimes.

Dr. Middleton also reviewed defendant's psychological assessment, prepared a week before the crime, that revealed defendant had been evicted from a sober living home, had no place to stay, and was cut off from his financial aid. Dr. Middleton agreed these facts were consistent with someone who was in need of money.

17.

The prosecutor introduced into evidence a recording and transcript of a jail call between defendant and another individual the day following defendant's arrest. Defendant advised the individual that he was in jail. Defendant told the individual that while he could not discuss the offenses because he was being recorded, "I didn't do nothin' I was just at the wrong time and place, got crossed up, man, I'm lookin' at some time, though." Dr. Middleton acknowledged that defendant did not report in the call that he was hearing voices, which might not have been consistent with someone in a delusional state. However, Dr. Middleton also speculated that defendant did not mention his hallucinations because he was aware the call was being recorded. Dr. Middleton conceded that defendant's statement was inconsistent with his later claim to have committed the robbery due to an auditory hallucination.

The prosecutor then introduced a video and transcript of a conversation between defendant and an officer on the day of his arrest. Defendant asked the officer if they had counted the money. The officer advised him that $600 had been taken. The officer asked, "You thought it was more?" Defendant replied, "Yeah, man." Defendant also stated, "You shoulda told me 3 or 4 thousand." Dr. Middleton testified that the video and transcript had no effect on his opinion but acknowledged that defendant's statements were goal oriented. In response to questioning by the prosecutor, Dr. Middleton admitted that defendant's actions were also goal oriented, including going into a bank with a gun, demanding money, concealing his identity by wearing a mask and hood, and wearing socks on his hands to prevent leaving DNA and fingerprints at the scene.

Dr. Middleton testified he attempted to obtain additional information from the defense but did not seek information from the prosecution, he had never been retained by a prosecuting agency to render an opinion in 28 years, and that rendering an opinion of insanity would increase the likelihood he would testify and earn more money from the court.

Dr. Middleton further acknowledged that he could not recall defendant's prior criminal history, but that defendant's prior robbery convictions and prison commitments would not affect his opinion. Dr. Middleton testified that his opinion would not be affected by the timing of defendant's decision to enter an insanity plea without additional information, defendant's planning and activities to arrange for the robbery, or that the police report failed to support defendant's claim that he had told officers when he was arrested that he was experiencing hallucinations. As to this latter factor, Dr. Middleton noted that the police report did reflect that the officers heard defendant yelling when he fled from them, but they could not understand the words.

Dr. Middleton testified that he conducted the Miller Forensic Assessment of Symptoms Test (M-FAST). Although he disputed that the test could be referred to as a "malingering" test, Dr. Middleton explained that the M-FAST is a screening instrument to assist in assessing an individual's believability when they claim to be experiencing symptoms of a mental condition. In defendant's case, Dr. Middleton originally scored defendant with a nine, "possibly indicative of malingering," but then changed the score to an eight after additional questioning of defendant, indicating "borderline malingering." While Dr. Middleton emphasized that the test was merely a screening procedure and not conclusive for determining symptom validity, he performed no other tests and instead relied upon defendant's statements and mental history to render his opinion.

### 4. Section 402 Hearing on Admission of Dr. Longwith's Testimony

Before the prosecution presented its case, the trial court heard evidence in accordance with Evidence Code section 402 to address defendant's motion to exclude Dr. Longwith's testimony. Defendant argued that Dr. Longwith's review of Dr. Haddock's report on defendant's competency compelled exclusion of his testimony.

The court heard testimony from Dr. Longwith regarding his review of the mental competency report. Dr. Longwith testified he was appointed by the court to examine defendant's sanity at the time of the offense. Along with the appointment, Dr. Longwith

received police reports and Dr. Haddock's competency evaluation report from the court. Dr. Longwith did not review the competency report until after he had examined defendant and formed his own opinion on sanity. When he later reviewed the report after forming his initial opinion, Dr. Longwith used it only to determine if defendant's statements to Dr. Haddock were consistent with those that defendant made to Dr. Longwith. Nothing in Dr. Haddock's report affected Dr. Longwith's own opinion or findings in the case. In formulating his opinion as to defendant's sanity, Dr. Longwith relied only on his personal interaction with defendant, his assessment of defendant's mental status, his findings based upon his assessment during the examination, and results of the three tests he administered during his evaluation of defendant. According to Dr. Longwith, Dr. Haddock's report was not material to his opinion, but he reviewed the report for consistencies or inconsistences, noting only two inconsistencies in defendant's statements that were not material to his findings.

Defendant argued that Dr. Longwith's review of the report was a violation of defendant's Fifth Amendment privilege. The trial court rejected such a broad reading of the law and, noting that Dr. Longwith relied only upon his own evaluation of defendant and police reports, found that Dr. Longwith's opinion did not rely upon anything contained within Dr. Haddock's competency evaluation.

### 5.     Sanity Phase—The Prosecution's Evidence

The prosecution called Dr. Gary Longwith who testified that he examined defendant on December 12, 2017, to evaluate whether defendant was sane at the time he committed the offense. Dr. Longwith initially introduced himself to defendant and explained the reason for the examination and the limited confidentiality to be given to defendant's statements. Thereafter, Dr. Longwith conducted a mental status examination that he described as an assessment of defendant's current cognitivity, including defendant's awareness of his surroundings and the current date and time, and whether defendant was under the influence of medication or drugs, suffering from any mental or

20.

physical distress, or responding to internal stimuli. Dr. Longwith described defendant's mental status as benign, although he seemed unusually happy. They also discussed defendant's mental history and medications.

Regarding the offense, Dr. Longwith noted that defendant claimed he told officers when arrested that he was experiencing auditory hallucinations, but that it was not reflected in the police reports. Dr. Longwith conducted several tests with defendant, including the M-FAST that assists with determining if a defendant is malingering. Defendant's score of nine placed him in a category of suspicion for malingering. Dr. Longwith also conducted a second test designed to further assess malingering, the malingering section of the Evaluation of Competency to Stand Trial-Revised (ECST-R), because defendant's score of nine on the M-FAST was close to the cut off and required additional testing. Dr. Longwith explained that an M-FAST score of over six is considered malingering but that an expert cannot rely on that test alone.

The ECST-R test assessed points for categories including realistic presentation, psychotic presentation, nonpsychotic presentation, impairment, and presentation style. Defendant's responses to the testing placed him in the suspected malingering range for each category, as did a totaling of points for all the categories. The results of this test caused Dr. Longwith to conclude defendant's score on the M-FAST was accurate and defendant was malingering.

Dr. Longwith next conducted the Wechsler Abbreviated Scale of Intelligence Test that indicated defendant was in the low-average range but also observed that defendant was not trying to answer the questions and could have scored higher. Dr. Longwith also used the Montreal Cognitive Assessment, a kind of rapid screening instrument for cognitive status, that measures attention, concentration, memory, language, orientation, executive functions, and orientation. Defendant's score of 19 placed him in the impaired range, causing Dr. Longwith to believe he was deliberately not answering the questions correctly. Dr. Longwith also conducted the Saint Louis University Mental Status

21.

Examination. Defendant's score on this exam was so low as to indicate defendant suffered from dementia or Alzheimer's disease, however, as neither defendant's medical history nor presentation supported such a diagnosis, Dr. Longwith concluded that defendant intentionally depressed his performance.

Based upon a reading of the police reports, defendant's statements to Dr. Longwith, the malingering scales, and test results, Dr. Longwith concluded that defendant was probably sane during the commission of the crime. Dr. Longwith later explained that when he used the term "probably," he meant "more likely than not." In response to questioning by the court, Dr. Longwith clarified that he used the term "sane" to mean that defendant appreciated the consequences of his behavior and knew the difference between right and wrong. Dr. Longwith acknowledged defendant told him that he experienced auditory hallucinations that caused him to commit the offense, but Dr. Longwith discounted those statements because the testing showed that defendant was malingering and not telling the truth.

Dr. Longwith reviewed Dr. Middleton's report and noted similarities in the mental history, statements of defendant, and M-FAST scores but noted that Dr. Longwith did not agree with Dr. Middleton's conclusion that defendant was insane at the time of the offense.

The prosecution called an officer who apprehended defendant after the robbery. He testified that witnesses showed him the general area where the robber had fled, and the officer found him in that area. When ordered to stop, defendant fled. The officer's partner chased defendant while the officer drove his vehicle in an area to cut off defendant's avenue of escape. When the officer determined defendant never made it out of the area, he joined his partner who was attempting to apprehend defendant while defendant was trying to hide inside a drainage pipe. Defendant resisted and was subdued when the officer grabbed him and placed him on the ground. Defendant continued to resist arrest and the officer struck defendant in the back of the head and in the area of his

nose and face. After defendant's arrest, the officers searched defendant and his route of flight and located a BB gun, a mask made from a shirt, socks, scattered currency, and a motel key.

Defendant never advised the officer that he committed the robbery because he had been hearing voices.

Detective Sporer also testified that he participated in a search of defendant's motel room, finding defendant's identification and a shirt that had been cut in half, matching the portion of the shirt defendant had used as a mask.

### 6. The Trial Court Rejected Defendant's Insanity Defense

The trial court concluded that while defendant might have suffered from a diagnosable mental illness, that mental illness did not necessarily meet the standard of legal insanity. The court noted that Drs. Middleton and Longwith agreed on the history and ultimate diagnosis of defendant but disagreed on whether to believe defendant's explanation that a voice told him to rob the bank or he and his family would be killed. Concluding that resolution of the issue depended upon defendant's credibility, the trial court discounted the credibility of defendant's expert because he failed to follow up the M-FAST malingering test with additional testing, and failed to consider the significance of the video and jail call evidence in which defendant never mentioned he was hallucinating during the conversations. As both experts concluded that defendant knew his conduct was illegal, attempted to disguise himself during the crime, and fled after, the trial court concluded that defendant understood the difference between right and wrong and was, therefore, sane during the commission of the crime.

### B. Legal Principles and Standard of Review

The Fifth Amendment privilege against self-incrimination is generally applicable to custodial mental competency examinations. (*Estelle v. Smith* (1981) 451 U.S. 454, 468.) To compel a defendant to submit to a competency examination, the examination

must be conditioned upon only using the statements and examination results for a competency determination. (*Ibid*.) Defendants who are examined pursuant to section 1368 for a competency determination receive judicial immunity for their statements that is implied from the statute to protect their Fifth Amendment privilege. (*People v. Arcega* (1982) 32 Cal.3d 504, 520 [confirming judicial immunity against use, in prosecution's case-in-chief, of accused's compelled statements to court-ordered competency examiners through testimony of competency examiner]; *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 469 [in reviewing contempt order as to defendant who refused to participate in competency examination, recognizing that rule of immunity for competency examinations is necessary to ensure that an accused is not convicted using his own statements made at a court-compelled examination and will necessitate different psychiatrists be appointed for addressing insanity defense].) The scope of the privilege against self-incrimination requires that neither statements so compelled, nor any information directly or indirectly derived from such statements, may be used against the defendant. (*Kastigar v. United States* (1972) 406 U.S. 441, 453 (*Kastigar*) [in the context of the federal immunity statute, describing use and derivative use immunity as coextensive with the scope of the privilege against self-incrimination, and therefore sufficient to compel testimony over a claim of the privilege].)

Once the defendant establishes that his statements have been compelled, the prosecuting authorities " ' "have the burden of showing that their evidence is not tainted." ' " (*People v. Singleton* (2010) 182 Cal.App.4th 1, 12–13 (*Singleton*) [analyzing use of the defendant police officer's statements compelled during administrative investigation during criminal trial], citing *Kastigar*, *supra*, 406 U.S. at p. 460.) The prosecution must establish by a preponderance of evidence that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. (*Singleton*, at pp. 12–13.)

"Provided that the trial court has applied correct legal principles, we review a finding that the prosecution has carried its burden for the existence of substantial evidence. (See *U.S. v. Koon* (9th Cir. 1994) 34 F.3d 1416, 1433, rvd. in part on another ground *sub. nom. Koon v. United States* (1996) 518 U.S. 81, 100 [findings reviewed for clear error]; *U.S. v. Gallo* (2d Cir. 1988) 859 F.2d 1078, 1091 [same]; *People v. Jackson* (1992) 10 Cal.App.4th 13, 22 ['[T]here is no practical difference between the federal "clearly erroneous" test and a substantial evidence standard of review.'].)" (*Singleton*, *supra*, 182 Cal.App.4th at pp. 13–14.)

## C. Dr. Longwith Did Not Use Defendant's Immunized Competency Statements

Relying on *In Re Hernandez* (2006) 143 Cal.App.4th 459 (*Hernandez*), defendant argues that Dr. Longwith's testimony was inadmissible because he considered Dr. Haddock's report on defendant's competency during preparation of his report regarding defendant's sanity. For the reasons set forth below, we disagree. For accuracy, we define the fruit of defendant's statements during the competency evaluation as the competency expert's impressions and testing results—information contained within the report but not the report itself. (See *id.*, at p. 477.) This defines the operative analysis as whether the prosecution's sanity expert used defendant's statements to the competency expert or the competency's expert impressions and testing results as a basis for his opinion when testifying, not whether the sanity expert reviewed the competency report. We note that a mere review of defendant's compelled statements is not a "use" of them that violates the Fifth Amendment.[6]

---

[6] We disagree with *Hernandez* to the extent it concludes that the expert's review of the competency evaluations, as opposed to use of them in forming an opinion as to sanity, is an impermissible use of the fruits of defendant's competency evaluation for the reasons we discuss. (See *Hernandez*, *supra*, 143 Cal.App.4th at p. 477.)

The Fifth Amendment is only violated when there is a use of the immunized statements, or evidence derived therefrom, in the sanity phase. "[T]he Fifth Amendment does not directly prohibit the government from *eliciting* self-incriminating disclosures despite the declarant's invocation of the Fifth Amendment privilege. Absent a valid waiver of Fifth Amendment rights, this constitutional provision simply bars the direct or derivative *use* of such officially compelled disclosures to convict or criminally punish the person from whom they were obtained." (*Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1127 [reviewing the Fifth Amendment implications of pretrial discovery where the defendant's mental state to be an issue at trial].)

Dr. Longwith's review of defendant's compelled statements during the competency proceeding, by itself, does not require exclusion of his testimony. " '[A] witness's exposure to immunized testimony does not constitute "an incurable disease .… [T]he defendant['s] Fifth Amendment rights are not infringed if a witness hears immunized testimony and yet testifies solely to facts personally known to the witness." ' " (*Singleton*, *supra*, 182 Cal.App.4th at p. 14.) Ensuring the witness's knowledge is based on personal knowledge meets the *Kastigar* requirement that compelled statements not be used against the defendant. (*Ibid*., citing *People v. Gwillim* (1990) 223 Cal.App.3d 1254, 1272; *U.S. v. Koon*, *supra*, 34 F.3d at pp. 1432–1433.)

Our analysis begins with an examination of whether the prosecution's expert used defendant's statements, made during the competency examination, as a basis for his testimony. (See *Singleton*, *supra*, 182 Cal.App.4th at pp. 13–15.) In *Singleton*, an expert testified at trial regarding his opinion as to whether the defendant (a police officer) had control of a suspect. The expert, however, had also previously reviewed the defendant's immunized statements during the administrative investigation of the defendant's conduct. (*Id*. at p. 15.) The expert testified that he was asked to view the recording of the incident, interpret it solely based on his own experience, and provide an opinion without relying upon the defendant's statements. (*Ibid*.) During his testimony, the expert viewed the

26.

video, explained to the jury what they were seeing, and provided an opinion based upon the video images.  (*Id.* at p. 16.)  "As the images and [the expert's] experience are independent of the compelled statement, they satisfy the requirements enunciated in *Kastigar* and its progeny.  We have carefully reviewed the video recording and [the expert's] testimony addressing it, and we discern nothing in the testimony that is not traceable to these independent sources."  (*Id.* at p. 17.)  Rather than just relying upon the witnesses' assurances, the independence of the testimony was confirmed because the expert described images from a video recording and relied on his training and experience acquired before being exposed to the defendant's compelled statements.  (*Ibid.*)

Here, Dr. Longwith testified that he did not review the competency report until after he had examined defendant and formed his own opinion on sanity.  Dr. Longwith testified that nothing in Dr. Haddock's report affected his own opinion or findings in the case.  In formulating his opinion as to defendant's sanity, Dr. Longwith relied only on his personal interaction with defendant, his assessment of defendant's mental status, findings based upon his assessment during the examination, results of the tests he administered during his evaluation of defendant, and police reports.  According to Dr. Longwith, Dr. Haddock's report was not material to his opinion, but he reviewed the report for consistencies or inconsistences, noting only two inconsistencies that were not material to his findings.

After a careful review of the record, we find that Dr. Longwith's testimony was based upon the statements he obtained directly from his own evaluation of defendant, the numerous tests he himself conducted of defendant, and his own review of police reports.  We find that Dr. Longwith had an independent basis for his opinion, based on his own personal interaction with defendant.  His sanity phase testimony described percipient observations of defendant, five tests administered to defendant, and some of defendant's statements to him.  He did not include Dr. Haddock's report as a basis for his opinion.

27.

While Dr. Longwith testified at the section 402 hearing that he did not rely upon anything in the competency evaluation report, a comparison of Dr. Haddock's report to both Dr. Longwith's report and testimony confirms the independence of his opinion. Defendant made a lengthy statement to Dr. Longwith that, while more detailed, included the same statements defendant made to Dr. Haddock. Dr. Longwith's report indicates that he obtained defendant's medical history directly from defendant, not relying upon Dr. Haddock's report. Dr. Longwith's report describes the various tests he conducted. Nothing in Dr. Longwith's summary, finding, or diagnosis sections of his report indicate any reliance on the competency evaluation or statements therein as a basis for his opinion or testimony.

Defendant argues that Dr. Longwith testified he considered the report and used it to bolster his opinion. Although Dr. Longwith reviewed the competency report, his testimony establishes that because defendant's statements were consistent with those statements defendant also made to him, the contents of the report did not factor into his opinion. We find that Dr. Longwith's own interview of defendant is an independent source for his opinion.

The record confirms that Dr. Longwith's own testing of defendant was an independent source for his testimony as well. Dr. Longwith testified as to the several tests he conducted and his conclusion that defendant was malingering (not truthful in describing his mental state at the time of the offense) based only upon tests Dr. Longwith conducted. Since Dr. Haddock had concluded that defendant was not malingering during the competency examination and conducted different tests at a different point in time, we cannot see how Dr. Longwith could have used Dr. Haddock's testing or mental impressions in reaching his conclusion.

Defendant argues that our decision should be governed by *Hernandez*, but we find that case distinguishable on its facts. (See *Hernandez*, *supra*, 143 Cal.App.4th 459.) In *Hernandez*, the prosecution called three experts to testify at the defendant's sanity trial.

28.

Two of the experts had either examined or treated the defendant in relation to competency proceedings. (*Id*. at pp. 473–474.) The third expert was appointed to examine the defendant regarding his insanity plea but testified that she obtained and used " 'every bit of information gathered by all the other doctors' " and, in her testimony, frequently referred to observations and conclusions of the competency evaluators. (*Id*. at p. 474) That did not occur in this case.

We find that Dr. Longwith did not use defendant's statements to the competency evaluator, or the opinions and testing that resulted from the competency examination, in formulating his opinion. Thus, Dr. Longwith's testimony did not rely on the mental competency evaluation, and accordingly, it was not inadmissible under the rule of immunity. As such, the trial court did not err in in denying defendant's motion to exclude Dr. Longwith's testimony.

### III. *The trial court erred in imposing three 5-year prior serious felony conviction enhancements where the three felonies were not brought and tried separately.*

The trial court imposed four 5-year prior serious felony conviction enhancements based on defendant's convictions in 1991 and 1993. One of the robbery convictions was rendered in Kern Superior Court case No. SC046648A.[7] However, three of the 1993 convictions—assault with intent to commit forcible rape, first degree robbery, and oral copulation with a minor—were rendered in Kern Superior Court case No. SC053863A.

Defendant contends the trial court erred by imposing three prior serious felony conviction enhancements for his convictions in Kern Superior Court case No. SC053863A because those convictions were not the result of "charges brought and tried separately" within the meaning of section 667, subdivision (a)(1). The People concede the error and we agree. To satisfy the " 'brought and tried separately' " requirement, prior proceedings must be formally distinct from filing to adjudication of

---

**7**      Defendant does not challenge this prior serious felony conviction enhancement.

guilt. (*In re Harris* (1989) 49 Cal.3d 131, 136.) In accord with *Harris*, defendant's three convictions in Kern Superior Court case No. SC053863A were not based on charges brought and tried separately. Consequently, the trial court erred in imposing three 5-year enhancements based on a single conviction, and two of the enhancements must be stricken.

## IV.     *We remand for the trial court to consider Senate Bill No. 1393.*

Senate Bill No. 1393 (2017–2018 Reg. Sess.), signed into law on September 30, 2018, amended sections 667 and 1385 to provide the trial court with discretion to strike, in furtherance of justice, five-year enhancements imposed pursuant to section 667, subdivision (a)(1) (Stats. 2018, ch. 1013, §§ 1, 2). The new law took effect on January 1, 2019. The law is applicable to those parties, like defendant, whose appeals were not final on the law's effective date. (See *In re Estrada* (1965) 63 Cal.2d 740, 748.)

Defendant was sentenced in this case on November 28, 2018, after Senate Bill No. 1393 was passed but before it took effect. At sentencing, the court imposed four 5-year section 667, subdivision (a) enhancements without further comment.

Defendant contends his case should be remanded to permit the trial court to exercise its newfound discretion and consider whether to strike the remaining prior serious felony conviction enhancements imposed pursuant to section 667, subdivision (a)(1). The People concede remand is necessary on this basis.

We accept the People's concession and remand to the trial court for it to determine whether to exercise its discretion to strike the two remaining prior serious felony enhancements.

## V.     *The trial court did not err in ordering defendant to pay fines, fees, and assessments without determining his ability to pay.*

As part of defendant's sentence, the trial court ordered that defendant pay a robbery fine in the amount of $10 (§ 1202.5), a minimum restitution fine of $300 (§ 1202.4 subd. (b)), court operations assessments totaling $120 (§ 1465.8), and court

facilities assessments totaling $90 (Gov. Code, § 70373).  Defendant argues the court violated his due process rights by imposing these fines, fees, and assessments without determining whether he had the ability to pay these amounts.  Defendant's due process argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced and while his current appeal was pending. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines or fees.  (*Id*. at p. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488– 489.)  Relying on *Dueñas*, defendant asks this court to "order the fine under section 1202.5, the court security fee, and the conviction assessment be stricken, and the restitution fine stayed unless and until the trial court holds an ability to pay hearing and concludes that [defendant] has the present ability to pay the restitution fine."  The People agree that since the case will be remanded for resentencing on other grounds, that defendant also be permitted to request that the trial court consider his ability to pay the various fines, fees, and assessments—with the proviso that any challenge to punitive fines must be evaluated under Eighth Amendment standards, rather than due process principles.

We find defendant's assertions unpersuasive and decline to stay or vacate the imposed fines and fees or to remand on this basis.  In *Dueñas*, the defendant lost her driver's license because she was financially unable to pay her juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1161.)  She continued to reoffend for driving with a suspended license because the aggregating criminal conviction assessments and fines prevented her from recovering her license.  (*Ibid*.)  The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty."  (*Id*. at pp. 1163, 1164.)  The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations.  (*Id*. at p. 1168.)  *Dueñas* determined those

31.

unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Ibid*.)

We decline to expand *Dueñas*'s holding beyond the unique facts found in that case. Unlike the *Dueñas* defendant, here, defendant does not establish the violation of a fundamental liberty interest. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056 (*Lowery*).) His incarceration was not a consequence of prior criminal assessments and fines. He was not deprived of liberty because of his indigency. Accordingly, as we recently explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), we believe an Eighth Amendment analysis, as opposed to a due process analysis, is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Id*. at pp. 1069–1072; accord, *Lowery*, at pp. 1056–1057 [due process not violated when defendants are not denied access to the courts, not prohibited from presenting a defense, not incarcerated due to an inability to pay prior fees, fines, or assessments, do not face ongoing unintended punitive consequences, or do not suffer a violation of a fundamental liberty interest]; *People v. Son* (2020) 49 Cal.App.5th 565, 599–601 (conc. & dis. opn. of Franson, J.) [no violation of fundamental liberty interest where trial court imposed disputed fees, fines, and assessments without first conducting an ability to pay hearing; case did not present unique concerns addressed in *Dueñas*—defendant was not incarcerated because of his indigency, but for his continuing violent criminal acts while serving a life prison term]; but see *id*. at pp. 577–579 (lead opn. of Smith, J.) [nonpunitive court facilities and court operations assessments may not be imposed on a defendant who is unable to pay because these charges are imposed on court users for use of the court, burdening their exercise of the fundamental right of access to the criminal courts].) Under that standard, we cannot conclude the $300 minimum restitution fine and $220 in fines, fees, and assessments imposed in this case are grossly disproportionate to defendant's level of culpability; thus,

they are not excessive under the Eighth Amendment.  (*Aviles*, at p. 1072; accord, *Lowery*, at p. 1058.)

In any event, even if we agreed with *Dueñas*, we would still reject defendant's constitutional claims and find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt since defendant has the ability to pay the fine and fees imposed in this case.  (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031, 1035; *Aviles*, *supra*, 39 Cal.App.5th at pp. 1075–1077.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.]  "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.]  This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody."  (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076.)

We can infer from the instant record that defendant has the ability to pay the aggregate amount of fine and fees from probable future wages, including prison wages. (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076; *Lowery*, *supra*, 43 Cal.App.5th at pp. 1060–1061; accord, *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)  The court sentenced defendant to 50 years' imprisonment and there is nothing in the record that shows defendant would be unable to satisfy the fines and fees imposed by the court while serving his prison term.  While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from prison wages during his prison sentence.  (See, e.g., *People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, [the defendant] will have sufficient time to earn these amounts during his sentence, even assuming [he] earns nothing more than the minimum"]; see also *People v. Lewis* (2009) 46 Cal.4th 1255, 1321 [concluding large restitution fine which

would be deducted from portion of any funds given to the defendant by his family was not inappropriate]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [court did not abuse its discretion in imposing maximum fine although it may be difficult for the defendant to pay it].)

We thus conclude, based on the record before us, that defendant is able to pay the statutory minimum restitution fine and the mandatory assessments he was ordered to pay. He is not entitled to remand for a hearing on the subject.

## VI. *Defendant failed to raise the issue of mental health diversion at the trial court level and has forfeited the issue on appeal.*

On June 27, 2018, the Legislature enacted section 1001.36, which took effect immediately. (Stats. 2018, ch. 34, §§ 24, 37.) Under this provision, certain defendants suffering from qualifying mental disorders may be eligible for pretrial diversion (§ 1001.36, subd. (a)), defined as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment" (*id.*, subd. (c)). "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).) The defendant is the one who must raise the issue of diversion. (See *id.*, subd. (b)(1)(A) ["Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert"].)

Defendant contends that the case should be remanded to allow the court to conduct a mental health diversion eligibility hearing, arguing that section 1001.36 is retroactive. Our Supreme Court has held that defendants who were tried before the effective date of section 1001.36 could seek pretrial diversion even after the adjudication of guilt so long as their convictions were not yet final. (*People v. Frahs* (2020) 9 Cal.5th 618, 632.) *Frahs* was careful to limit its analysis to the availability of section 1001.36 to these

34.

pipeline defendants, and to note that its holding involved a "quite different" question from how the "statute normally will apply going forward" as to defendants who had had the opportunity seek pretrial diversion from the very beginning. (*Frahs*, at p. 633.)

Defendant's entire retroactivity argument is misplaced. The record shows that defendant stipulated to the amended information on October 9, 2018, the court trial on sanity concluded on October 17, 2018, and the sentencing hearing took place on November 28, 2018. In other words, this all occurred after June 27, 2018, the effective date of section 1001.36, which had already been in effect for almost four months before defendant was convicted and then sentenced. Thus, the option of seeking pretrial diversion was available to defendant. For reasons not apparent from the record, however, he failed to avail himself of it.[8]

Generally, "a party may forfeit a right to present a claim of error to the appellate court if he did not do enough to 'prevent[]' or 'correct[]' the claimed error in the trial court." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) In his brief, defendant recognizes that section 1001.36 was in effect as of June 2018 and that he was sentenced several months after that time. Defendant's failure to raise the issue of mental health diversion has forfeited the issue on appeal. (See *People v. Graham* (2021) 64 Cal.App.5th 827, 835 [alternatively holding that defendant forfeited right to invoke section 1001.36 by not requesting it before jury returned its verdict].)[9]

---

[8]     Defendant did move for the trial court to continue his sentencing hearing and refer him to Sustained Treatment and Recovery Court (STAR). The court acknowledged receipt of the motion and implicitly denied it when sentencing defendant. Defendant acknowledges his motion was not a request for mental health diversion pursuant to section 1001.36, and that STAR is a separate program.

[9]     The People have brought to our attention cases addressing the timeliness of a defendant's request for pretrial diversion. Because defendant failed to request pretrial diversion, we do not address the issue. (See *People v. Braden* (2021) 63 Cal.App.5th 330, review granted July 14, 2021, S268925 [request for pretrial diversion timely if made before trial begins]; *People v. Curry* (2021) 62 Cal.App.5th 314, review granted July 14, 2021, S267394 [request for pretrial diversion timely if made prior to sentencing]; *People v. Graham*, *supra*, 64 Cal.App.5th 827, review granted Sept. 1, 2021, S269509 [request for pretrial diversion made for first time on appeal

35.

In passing, defendant asks us to "exercise [our] discretion to consider the issue in light of the fact that the statute was recent, the record shows that [defendant] is eligible for diversion, and the issue affects [defendant]'s substantial rights." We acknowledge that "[a]n appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams*, *supra*, 17 Cal.4th at p. 161, fn. 6.) "Whether or not it should do so is entrusted to its discretion." (*Ibid.*) Given defendant's opportunity to raise the issue below, we decline his request.

Recognizing the flaw in his retroactivity argument, defendant urges us to nevertheless remand his case, arguing that his counsel's failure to seek pretrial diversion below should not preclude remand to allow him to now seek diversion.

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient, and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a

---

untimely as required to be made at least before verdict but not deciding whether should also be made before trial begins].)

36.

reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [the California Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Ibid.*)

The record before us does not reveal why defense counsel did not request a hearing on defendant's eligibility for mental health diversion. Absent any affirmative evidence that there was no rational tactical purpose for counsel's forbearance, "it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal." (*Mickel*, *supra*, 2 Cal.5th at p. 200.)

Defendant maintains that this court should entertain his ineffective assistance claim on direct appeal where " 'there simply could be no satisfactory explanation' related to defense tactics or strategy for counsel's failure to act." We disagree. There could have been legitimate reasons why defense counsel may have chosen not to pursue a mental health diversion eligibility hearing on defendant's behalf. For instance, counsel may have concluded that any qualifying mental disorder did not play a significant role in the commission of the charged offenses. Also, counsel could have discussed the matter with defendant, but the latter refused to consent to diversion or comply with mental health treatment. We once again emphasize that the record is silent on the matter. Having found forfeiture, our analysis ends.

*VII.* ***Defendant's prior prison term enhancement for robbery must be stricken considering Senate Bill No. 136.***

Defendant argues one prior prison term enhancement, for a 1991 robbery conviction, must be stricken based on the retroactive application of Senate Bill No. 136. The People agree, as do we.

Effective January 1, 2020, Senate Bill No. 136 (2019–2020 Reg. Sess.) amended section 667.5, subdivision (b) to limit application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)  That amendment applies retroactively to all cases not yet final on Senate Bill No. 136's effective date.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342, citing *In re Estrada*, *supra*, 63 Cal.2d 740 at p. 746.)

Here, the trial court imposed two 1-year section 667.5, subdivision (b) prior prison term enhancements for (1) a prison term served for first degree robbery (§ 212.5, subd. (b)) (1991 conviction) and (2) a prison term served for assault with intent to commit rape (§§ 220, 261, subd. (a)(2)), first degree robbery (§ 212.5, subd. (b)), and oral copulation with a minor (former § 288a, subd. (c)) (1993 conviction).  Only the latter prison term was served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  On January 1, 2020, defendant's case was not yet final.  Therefore, as the parties agree, defendant is entitled to the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5, subdivision (b). Defendant's prior prison term enhancement for his 1991 robbery conviction must therefore be stricken.  His remaining prior prison term enhancement is unaffected by the amendment to section 667.5.

**DISPOSITION**

The case is remanded to the trial court with directions to (1) strike two of the five-year prior serious felony conviction enhancements based on defendant's 1993 conviction

(§ 667, subd. (a)(1)), (2) strike the one-year prior prison term enhancement based on defendant's 1991 robbery conviction (§ 667.5, subd. (b)), and (3) determine whether to exercise its discretion to strike the two remaining five-year prior serious felony conviction enhancements (§ 667, subd. (a)(1)). The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the modifications. In all other respects, the judgment is affirmed.

                                                                         HILL, P. J.

WE CONCUR:


DETJEN, J.


FRANSON, J.